IVAN N. and BOZENA C. HORVAT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Horvat v. Commissioner
Docket No. 3103-77.
United States Tax Court
T.C. Memo 1978-153; 1978 Tax Ct. Memo LEXIS 364; 37 T.C.M. (CCH) 679; T.C.M. (RIA) 780153; April 19, 1978, Filed Ivan N. and Bozena C. Horvat, pro se. Robert J. Percy, *365 for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to and heard by Special Trial Judge Edna G. Parker pursuant to the provisions of section 7456(c) of the Code. [1] The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PARKER, Special Trial Judge: Respondent determined a deficiency of $2,137.99 *366 in petitioners' Federal income tax for 1973. The four issues are (1) the proper computation of the sick pay exclusion for each spouse, (2) the deductibility of certain items as medical expenses, (3) the amount deductible for an office or offices in the home, and (4) the deductibility of automobile expenses as business expense. FINDINGS OF FACT Petitioners Ivan N. Horvat and Bozena C. Horvat, husband and wife, resided in Monroeville, Pennsylvania, at the time of filing the petition in this case. They filed a timely joint Federal income tax return for 1973. Sick Pay Exclusion
Both petitioners were employed full-time by Westinghouse Electric Corporation, the husband as an engineer and the wife as a draftsperson. On their 1973 joint return they excluded from their gross income an amount of $4,700 as sick pay. Mrs. Horvat was absent from her employment because of illness from March 23, 1973 through August 26, 1973. From March 23, 1973 through April 30, 1973, she continued to receive her full regular salary, but thereafter she was placed on the disability roll and received $87 per week under Westinghouse's insurance benefit plan. She returned to work on August 27, 1973. *367 Respondent excluded the first 30 days (March 23, 1973 to April 21, 1973), during which Mrs. Horvat continued to receive her full regular salary. Respondent then applied the sick pay exclusion of $20 per day to the remaining six work days that she continued to receive her regular salary, for a total sick pay exclusion of $120. Respondent concedes that the $87 per week benefit is excludable as sick pay, but no part of the $87 per week benefit had been included in the wife's W-2 or reported in income. As a result of surgery Mr. Horvat was absent from his job with Westinghouse from August 20, 1973 until October 6, 1973. After his return to work on October 7, 1973, he thereafter missed work intermittently, as follows: Hours Absent 5-day week
Worked
Sickness
Holiday
Total
10/7/73 to 10/11
20
20
0
40
10/14/73 to 10/18
25
15
0
40
10/21/73 to 10/25
25
15
0
40
10/28/73 to 11/1
37
3
0
40
11/4/73 to 11/8
40
0
0
40
11/11/73 to 11/15
16
24
0
40
11/18/73 to 11/22
0
40
0
40
11/25/73 to 11/29
0
24
16
40
12/2/73 to 12/6
37
3
0
40
Total
200
144
16
360 He continued to receive his full regular salary from Westinghouse *368 for all periodsof absence from August through December, 1973. Respondent excluded the first 30 days (from August 20, 1973 through September 18, 1973) in recomputing Mr. Horvat's sick pay exclusion. Respondent allowed a sick pay exclusion of $260 (13 working days X $20 per day) for the period of September 19, 1973 through October 6, 1973 when he returned to work, but nothing thereafter. Of the $4,700 claimed by petitioners as sick pay exclusion, respondent allowed $380. Medical Deductions
Petitioners deducted as medical expense $447.10 for a hearing aid, which was disallowed on the ground that the hearing aid was purchased for a relative or some other person who was not a dependent. Petitioners now concede that the item was not a proper medical deduction. Petitioners also deducted $342 as "physical therapy." That amount represented the expenses of lodging, meals, and travel of Mrs. Horvat on a trip she and her husband took to Florida in July of 1973. Mrs. Horvat had certain back problems in 1973, but the record does not show the nature of her back problems or her doctor's diagnoses, treatments, or prescriptions, if any, for that condition. On audit and at trial *369 petitioners claimed as medical deductions the expenses of bringing two persons over from Yugoslavia. Mrs. Horvat's absence from work because of illness began on March 23, 1973. On May 16, 1973, she paid the air fare for a Mr. and Mrs. Kos-Tusek for a round-trip flight by JAT charter for the period July 26 through November 8, 1973. Some time in July of 1973 Mr. and Mrs. Horvat took the trip to Florida as indicated above. On or about July 26, Mr. and Mrs. Kos-Tusek arrived in this country. The Kos-Tuseks were related to Mrs. Horvat in some way. Neither Mr. nor Mrs. Kos-Tusek was a doctor, nurse, physical therapist or any other type of qualified medical person. There is a vague suggestion that Mrs. Kos-Tusek may have been some type of practical nurse, but the record does not show her qualifications, if any. Mrs. Horvat returned to her job on August 27, 1973. Shortly before that date, Mr. Horvat entered the hospital and on August 20, 1973, he was operated on, having an internal and external hemorrhoidectomy, ulcerectomy, and sphincterotomy. Mr. Horvat returned to his job on October 7, 1973. Mr. and Mrs. Kos-Tusek returned to Yugoslavia on or about November 8, 1973. During *370 their stay with petitioners, Mrs. Kos-Tusek may have given Mrs. Horvat occasional back rubs or massages. The Kos-Tuseks were not qualified to and did not render any medical services or treatments to either Mr. or Mrs. Horvat. There is no proof that the Kos-Tuseks performed any services at all, except possibly household or domestic work. Petitioners claim as medical deductions the following expenses incurred in connection with the Kos-Tuseks: Round-trip air fare from
Yugoslavia and return
$ 474
Mileage in United States
117
Meals
756
Salary (12 weeks X 5 days X
8 hours X $2.50 per hour)
$1,200
Total
$2,547
Offices in the Home
Petitioners deducted $1,200 as the expense of maintaining two offices in their home in 1973. Respondent allowed $204.90 of that amount. Petitioners relied on what they claim was the fair rental value of the house, and the computed two-fifths (two of five rooms) of the alleged fair rental value and utilities, plus certain furnishings. Respondent allowed one office (one of seven rooms) and computed one-seventh of the depreciation, utilities and insurance for the house. Depreciation was based on the cost of the house ($37,000) *371 less the value of the land ($12,000) over a 30-year life. There is no evidence in the record as to the fair rental value of petitioners' house in 1973. Petitioners' house contained three bedrooms, a living room, a family room, two and a half baths, a two-car garage and a basement laundry room.The Court finds as a fact that the house contained a kitchen, and that there were seven rooms in the house, rather than five. Mr. Horvat carried on a television and radio repair business from about 1971 to 1973. However, that business had become unprofitable and was completely abandoned sometime in 1973. Petitioners had engaged in some investment activity over the years. However, based on Mr. Horvat's study of the market in 1972 and his conclusion that the market would be very bad in 1973, they stayed out of the market completely in the year 1973. Automobile Expense
On their Schedule C for the television and radio repair business for 1973, petitioners reported gross receipts of $853.48. They deducted as business expense both a mileage allowance and certain itemized auto expenses as follows: Mileage (372 miles X $.15 a mile)
$ 55
Car repairs
236
Car depreciation
$1,260
*372 Petitioners owned two cars, the one in issue being the Mercedes Benz. The Mercedes was purchased in 1969 at a price of $5,165 (quoted European delivery), plus some $300- $500 more for customs duties and other charges.The car was placed into business use in 1971. Respondent determined the value of the car at the time it was converted to business use to be $3,000. Petitioners claimed a higher value of $7,500, but there is no evidence to support that figure. There is no dispute as to most of the items of actual expense, specifically the items of insurance, repairs and gas as listed in the statutory notice. The only item in dispute is depreciation. Respondent used the value of the car of $3,000. From this, he deducted $800 salvage value, and depreciated the resulting $2,200 over a three-year life. This resulted in a figure of $733.33 for depreciation, which was added to the other items of actual expense, for a total of $887.27. Respondent then determined that five percent of that amount, or $44.35, represented business use of the car. The proper figure for mileage allowance was $.12 per mile, rather than the $.15 used by petitioners. The corrected mileage allowance for *373 the 372 business miles driven in 1973 was $44.64. Since the mileage allowance was slightly larger than the actual itemized automobile expenses, respondent allowed the higher mileage allowance figure. OPINION Sick Pay Exclusion
At all times pertinent to this case, the Code allowed certain "sick pay" to be excluded from gross income. [2] Petitioners challenge respondent's imposition of a 30-day waiting period for this sick pay exclusion. They say there is no waiting period at all, and the the sick pay exclusion begins the first day of their respective periods of illness. They also disagree with respondent's imposition of a new 30-day waiting period to Mr. Horvat, after he had returned to work on October 7, 1973, from his first period of illness. Finally, they claim sick pay exclusion for the $87 per week benefits that had not been included in the wife's W-2, nor reported in income for the year. *374 Section 105 provided that gross income did not include amounts received under wage continuation plans when an employee was "absent from work" on account of personal injuries or sickness. There were complex requirements governing computation of the sick pay exclusion. Section 105(d) provided that: (d) Wage Continuation Plans.--Gross income does not include amounts referred to in subsection (a) if such amounts constitute wages or payments in lieu of wages for a period during which the employee is absent from work on account of personal injuries or sickness; but this subsection shall not apply to the extent that such amounts exceed a weekly rate of $100. The preceding sentence shall not apply to amounts attributable to the first 30 calendar days in such period, if such amounts are at a rate which exceeds 75 percent of the regular weekly rate of wages of the employee (as determined under regulations prescribed by the Secretary or his delegate). If amounts attributable to the first 30 calendar days in such period are at a rate which does not exceed 75 percent of the regular weekly rate of wages of the employee, the first sentence of this subsection (1) shall not apply to the extent *375 that such amounts exceed a weekly rate of $75, and (2) shall not apply to amounts attributable to the first 7 calendar days in such period unless the employee is hospitalized on account of personal injuries or sickness for at least one day during such period. If such amounts are not paid on the basis of a weekly pay period, the Secretary or his delegate shall by regulations prescribe the method of determining the weekly rate at which such amounts are paid. Thus, the sick pay exclusion was limited to a maximum weekly rate of $100, and there were waiting periods in some instances. Whether or not there was a waiting period before the exclusion applied depended upon two factors: (1) the proportion of salary covered by the wage continuation payments and (2) any hospitalization of the taxpayer. There was no waiting period if (1) the sick pay was 75 percent or less of the regular weekly wage rate and (2) the taxpayer was hospitalized for at least one day during the period. There was a 7-day waiting period if (1) the rate of sick pay was 75 percent or less of the regular weekly wage rate and (2) the taxpayer was not hospitalized during the period. There was a 30-day waiting period *376 if the sick pay was more than 75 percent of the regular weekly wage rate, and this was true whether or not the taxpayer was hospitalized during the period. Here both spouses received more than 75 percent of their regular pay, 100 percent in fact, during their first 30 days of absence from work. Thus, respondent properly applied the 30-day waiting period requirement to them. Kellner v. Commissioner,T.C. Memo. 1976-72, 45 P-H Memo. T.C. par. 76,072, 35 TCM 326, affd. 39 AFTR 2d 893, 77-1 USTC par. 9236 (2d Cir. 1977). The next issue is whether or not Mr. Horvat had to serve a new waiting period once he had returned to work on October 7, 1973. Section 1.105-4(e), Income Tax Regs., expressly provides that: The 7- or 30-day waiting period (whichever is applicable) applies to each period of absence from work because of personal injury or sickness, regardless of the frequency of such absences or the closeness in time to any prior period of absence from work because of personal injury or sickness. * * * Example (1). Employee A is absent from work because of sickness on Tuesday, January 7, 1964, and returns to work on the morning of Thursday, *377 February 13, 1964. He suffers a relapse and again becomes absent from work on the afternoon of Thursday, February 13, 1964. A's return to work on the morning of Thursday, February 13, 1964, terminates the first period of absence from work because of sickness, and a new period of absence from work because of sickness begins on the afternoon of Thursday, February 13, 1964. Mr. Horvat returned to work on October 7, 1973, and that terminated his period of sickness. For any days of intermittent absence from work after his initial return to work, he again received his full regular salary. To be eligible to exclude more sick pay from his gross income, he would have had to have a consecutive absence of over 30 days. He did not have that at any time after October 6, 1973. Therefore, respondent properly applied a new 30-day waiting period. As to the $87 per week benefits that Mrs. Horvat received after she was placed on the disability roll by her employer, those payments are clearly sick pay, and respondent so concedes. However, they were never included in her W-2 wage statements and never reported in income by petitioners. In other words, those amounts had already been excluded from *378 her gross income. What petitioners are suggesting would amount to excluding those amounts twice. Such a double benefit is clearly improper. There is no error in respondent's determination. Medical Deductions
Mrs. Horvat had certain back problems in 1973. Petitioners deducted $342 as "physical therapy." That represented her meals, lodging, and travel on a trip she and her husband took to Florida in July of 1973. Mr. Horvat testified that the trip was taken on the "strong suggestion" of the physician who was treating his wife's back condition, and that the doctor "prescribed" a warm climate and swimming in salt water. The record does not establish that the trip to Florida was anything other than a vacation trip, and, as such, a purely personal nondeductible expense under section 262.See Commissioner v. Bilder,369 U.S. 499 (1962). Petitioners now claim as a medical deduction some $2,547 in expenses for bringing two individuals, a Mr. and Mrs. Kos-Tusek, over from Yugoslavia, allegedly to care for Mrs. Horvat and possibly Mr. Horvat during their illnesses in 1973. These individuals were related to Mrs. Horvat in some way. They were not trained medical *379 personnel, and did not render any medical services or treatments to either Mr. or Mrs. Horvat.
Petitioners' testimony about these individuals was vague, evasive, and wholly unconvincing. The nature of the family relationship was never satisfactorily explained. The timing of the Kos-Tuseks' trip did not coincide with the periods of illness of either taxpayer. They didn't arrive until about the end of Mrs. Horvat's convalescence and they stayed on for a month after Mr. Horvat returned to work. The dates of their charter flight bore no relationship to the alleged purpose of their visit. On this record, the Court can only conclude that the Kos-Tuseks were relatives who simply came to visit the Horvats or to help out with the housework during their illnesses. Any expenses petitioners incurred in connection with these individuals were nondeductible personal expenses, not medical expenses. Offices in the Home
Petitioners say they maintained two offices in their home in 1973.The two offices were not claimed in connection with petitioners' employment at Westing-house Electric Corporation, but in connection with their investment activity and a television and radio repair business *380 the husband conducted in the home. At the outset there is a dispute as to the number of rooms in petitioners' house. It would seem that this would be a simple matter to prove. The number of rooms and floor plan of the house are readily susceptible of documentary proof, and are matters peculiarly within the knowledge of petitioners themselves. Respondent subpoenaed the architectural drawings of the house, but petitioners did not produce them.Nor did petitioners present any photographs, drawings, sketches, or anything else to show the floor plan. The record contains only the vague and confusing testimony of Mr. Horvat. He admitted that the house contains three bedrooms, a living room, a family room, two and a half baths, a two-car garage, and a basement laundry room. That would seem to be six rooms right there, not the five petitioners claim.[3] But the glaring omission would seem to be a dining room and kitchen, or at least a kitchen. When questioned about this, Mr. Horvat testified that the kitchen was a mere "niche," a part of the living room. The Court found the witness to be evasive and his testimony wholly unconvincing. Petitioners have failed to sustain their burden of *381 proof on this factual issue. The Court finds as a fact that the house has seven rooms. The next issue is whether one or two rooms were used as offices. In view of the fact that petitioners completely withdrew from the stock market in 1973 and that the television and radio repair business had become unprofitable and was finally completely abandoned sometime during that year, the Court is not persuaded that two rooms in the house were used as offices. Both petitioners had full-time jobs with Westinghouse when they were able to work, and both petitioners had long periods of absence from work because of illness that year. Also from about July 26 through November 8, 1973, there were two more individuals, Mr. and Mrs. Kos-Tusek, living in the house with petitioners. On this record we conclude that at most only one room was used as an office. As to petitioners' computations of the fair rental value of their *382 home, there is no evidence in the record to support their figures. Petitioners have not met their burden of proof, and there is no basis to change respondent's determination in regard to the office-in-the-home issue. Automobile Expenses
Petitioners deducted automobile expenses in connection with the television and radio repair business. They apparently no longer contend that they are entitled to both a mileage allowance and itemized actual automobile expenses. As to the itemized actual expenses, the only item still in dispute is depreciation. Petitioners have not presented any evidence to support a higher figure than respondent used for the value of the Mercedes Benz at the time it was converted to business use in 1971. Petitioners' principal objection to respondent's computation seems to be the five percent business use, petitioners contending that it should be 50 percent business use.Mr. Horvat's testimony on this matter was lacking in factual detail.He merely argued that it was somehow "unfair" to allow only a five percent business usage. Since the business miles actually driven in 1973, as reported by petitioners themselves, amounted to only 372 miles, the business *383 use of the car would appear to be minimal. That minimal usage is consistent with the fact that the business itself was failing and was actually abandoned some time during 1973. On this record, the Court has no basis to change respondent's determination. Since the figure for mileage allowance was slightly higher than that for itemized actual expense, respondent properly allowed petitioners the higher figure. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and as in effect during the pertinent tax year, unless otherwise indicated. This case was originally heard pursuant to the provisions of section 7463 as a small tax case, because the items placed in dispute did not exceed $1,500. However, in the course of the trial it became evident that the deficiency in dispute exceeded $1,500. The Court deleted the letter "S" from the docket number and assigned the case to Special Trial Judge Edna G. Parker for disposition pursuant to the provisions of section 7456(c) and Rules 180 and 181, Tax Court Rules of Practice and Procedure.↩ That order further provided that the provisions of Rule 182 shall not apply to the case.
2. Section 505 of the Tax Reform Act of 1976 repealed the sick pay provision and substituted a new disability income exclusion of $100 per week available only to taxpayers under 65 who have retired on disability as permanently and totally disabled. Pub. L. 94-455, 90 Stat. 1525, 1566.↩
3. In a written statement made during the audit, Mr. Horvat stated that the house had six rooms. When cross-examined about this letter at trial, he explained that he had used that figure strictly "for settlement purposes," an explanation the Court found unconvincing.↩